# EXHIBIT A

**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**COURT OF COMMON PLEAS OF PHILADELPHIA**

*Filed and Attested by the Office of Judicial Records 17 AUG 2023 04:24 pm G. IMPERATO*

BRYAN HAGER
105 Carbon Street
Phoenixville, PA 19460

Plaintiff,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION D/B/A "AMTRAK"
30th Street Station
30th and Market Streets, 5th floor
Philadelphia, PA 19104

Defendant

## NOTICE TO DEFEND

### NOTICE

**You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

Philadelphia Bar Association
Lawyer Referral
and Information Service
One Reading Center
Philadelphia, Pennsylvania  19107
(215) 238-6333
TTY (215) 451-6197

### AVISO

**Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.**

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
One Reading Center
Filadelfia, Pennsylvania  19107
(215) 238-6333
TTY (215) 451-6197

10-284

Case ID: 230801930

IN THE COURT OF COMMON PLEAS OF
PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| BRYAN HAGER<br>105 Carbon Street<br>Phoenixville, PA 19460<br><br>      Plaintiff,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER<br>CORPORATION D/B/A "AMTRAK"<br>30th Street Station<br>30th and Market Streets, 5th floor<br>Philadelphia, PA 19104<br><br>      Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:  No._____<br>:<br>:<br>:<br>:<br>:  JURY TRIAL DEMANDED<br>:<br>:<br>:<br>: |

## **COMPLAINT – CIVIL ACTION**

### INTRODUCTION

1. This action arises out of Plaintiff Bryan Hager's ("Plaintiff" or "Mr. Hager") reports to his superiors of waste and wrongdoing, including fraud and safety violations, which ultimately resulted in unlawful retaliation against him by Defendant Amtrak, including his unlawful termination from his management position at Amtrak.

2. Plaintiff brings this action pursuant to the Pennsylvania Whistleblower Law, which was specifically enacted by the Commonwealth of Pennsylvania to prohibit precisely the kind of unlawful and retaliatory employer conduct and actions that Amtrak took against Mr. Hager.

### THE PARTIES

3. Plaintiff Bryan Hager is an adult male who resides at 105 Carbon Street, Phoenixville, Pennsylvania 19460. He was employed by Amtrak and based out of its Philadelphia headquarters at 30th Street Station from approximately February 9, 2015 until

1

Case ID: 230801930

February 24, 2023, when he was fired from his management position as Assistant Production Engineer (APE).  He then was able to bid into subsequent employment with Amtrak on February 27, 2023 in the substantially lesser position as a van driver.

4. Defendant, National Railroad Passenger Corporation ("Amtrak" or "Defendant") is a for-profit corporation that operates intercity passenger rail services throughout the United States from its offices in 30th Street Station in Philadelphia, Pennsylvania.  Amtrak was created by Congress pursuant to the Rail Passenger Service Act of 1970 and incorporated in the District of Columbia in 1971, assuming the common carrier obligations of private railroads in exchange for the right to priority access of their tracks for incremental cost. As such, it is a federally chartered corporation with the federal government as majority stockholders. The Amtrak Board of Directors is appointed by the President of the United States and confirmed by the U.S. Senate.

5. At all times relevant hereto, Defendant Amtrak acted through its officers, agents, servants and employees identified subsequently hereinafter, who were acting within the course and scope of their employment with Amtrak.

## FACTUAL ASSERTIONS

6. Prior to accepting a management position in 2021, Plaintiff worked as a foreman for Amtrak's Tie Gang from 2017 to September 16, 2021. As a foreman, he underwent significant training and was responsible for supervising approximately 42 Amtrak union workers assigned to lay ties and tracks. Prior to qualifying as a foreman, Plaintiff worked on various track and tie gangs from February 9, 2015 to 2017.  Plaintiff is officially qualified to operate 90% of the equipment used in the Tie Gang.

7. On or about September 16, 2021, Plaintiff was promoted to the position of "Assistant Production Engineer (APE), Tie Renewal Program, Tie Gang, IMCS-Production," a

Case ID: 230801930

management position with a starting salary of $108,000.  This C-4 position also provided family health insurance, a per diem, retirement benefits, four weeks of paid personal leave, and use of a company truck, cell phone and laptop computer. In this position he was responsible for the daily operations of the Tie Gang, its production, and overseeing the improvement and adherence of the gang to a work plan, scope, schedule and budget.

8. Plaintiff's immediate supervisor was the Manager Engineering Production, who in turn reported to a Senior Manager Engineering Production.  All of these positions reported to the Deputy Chief of Production-Engineering.

9. Plaintiff was initially supervised by Pat Palmer, Manager Engineering Production, from September, 2021 until January 10, 2022, who also served in that position when Plaintiff was a foreman prior to Plaintiff moving up to management. It was Mr. Palmer who, knowing of Plaintiff's solid work ethic and prior performance as a foreman, encouraged him to apply for the management position, for which Plaintiff was ultimately hired. At all times, Mr. Palmer expressed approval of Mr. Hager's work performance and told Plaintiff that he was doing a good job as a manager.

10. In January, 2022, Benjamin J. Saffer ("Mr. Saffer") was promoted to Senior Manager Engineering Production.  Prior to this promotion, Mr. Saffer was the Manager of Engineering Production for the Track Laying System (TLS), overseeing the installation of tracks by machinery.  Mr. Saffer had no experience managing the installation of new tracks and ties by tie gang members, was not qualified to run any of the tie gang equipment and did not know the capability of the workers running the machines, or for that matter the specific properties and capabilities of the machines themselves.

3

Case ID: 230801930

11. The position of Manager Engineering Production of the Tie Gang was open from January, 2022, until it was filled by Dante J. DeAnnuntis in February, 2022. Plaintiff applied for the position without success and then reported to Mr. DeAnnuntis from February, 2022 until August 8, 2022, when Mr. DeAnnuntis left to take another position. While serving as the Manager of Engineering Production, Mr. DeAnnuntis reported to Mr. Saffer.

12. Beginning in January, 2022, Plaintiff worked with Mr. Saffer on the Thorn Tie Renewal Program, (the "Thorn Project") which had been largely pre-planned in scope, schedule and budget by Mr. Saffer and his predecessors, starting in July 2020, and was included in Amtrak's budget. The project entailed removing all old ties and tracks and installing all new ties and tracks from Thorn to Glen on the Paoli rail line. The deadline for completion of the project was behind schedule and it was overbudget due to poor scheduling of work crews, mistakes in sequencing tasks and mismanagement of project resources, all of which required ultimately more workers, resources, time and the expenditure of public funds to correct the mistakes.

13. In charge of planning for the Thorn Project, Mr. Saffer had made the decision to bring in the resurfacing gang first, followed by the rail work group and then the tie work group. The resurfacing gang destroyed part of the tracks and ties and should not have been brought in until after the tie gang came in, only then to be followed by the rail gang. As a result, the resurfacing gang destroyed more ties than what were supposed to be replaced. This increased the costs of the project because additional ties had to be purchased to replace the destroyed ties. Plaintiff repeatedly reported to Mr. Saffer that the project was poorly planned from the very beginning.

14. In the beginning of January, 2022, Mr. Saffer asked Plaintiff to revise the Thorn Project's completion date. Plaintiff presented a revised plan with a proposed completion date of

Case ID: 230801930

July, 2022. Mr. Saffer summarily rejected that plan as well as four other revised draft work plans which had been prepared by Plaintiff that January.

15.     Plaintiff repeatedly told Mr. Saffer that it would take the Tie Gang until July, 2022 to complete its work because the initial work plan was backwards.  Mr. Saffer would not agree with the completion date of July even though he had no prior experience in removing or supervising the removal of old ties and tracks and installing new ones. Mr. Saffer explained to Mr. Hager that he prefers to make aggressive plans and overpromises, in case he is able to pull it off, and then look like a star.  Notwithstanding Plaintiff's stated reservations, Mr. Saffer began implementing his plan and scheduled the rail gang to begin its work.

16.     In February, 2022, Mr. Saffer held a meeting with Plaintiff and Dante DeAnnunitis, the new Manager Engineering Production, and insisted that the tie replacement part of the project had to be completed within 30 days. Mr. Saffer also said the project was behind schedule, over budget, and that there would be no overtime. Once again, Plaintiff told Mr. Saffer that this completion date was unrealistic and pointed out again that all the delays and increased costs were caused by the wrong sequencing of the work gangs.  The Resurfacing Gang had destroyed many of the old ties when they did their work.  Moreover, the location of the old ties guides the installation of new ties and rails. Because the old ties were destroyed, it took more time for the rail gang to install the rails and for the tie gang to secure the rails. By the end of March, the Track Laying System Gang ("TLS") had only partially installed new rails halfway through the rail line before Mr. Saffer moved them to another project. The new rails were simply left on the tracks, which the Tie Gang had to move. The Tie Gang also had to secure the rails in each block before they could start their work replacing the ties.

Case ID: 230801930

17. During February and March, 2022, Plaintiff continued to express his disagreement with Mr. Saffer over the Thorn Project completion deadline.

18. During this period, Plaintiff discussed the problems with the Thorn Project as well as Mr. Saffer's management style with Pat Palmer, his former supervisor and Greg Mahowsky, Senior Manager Structures. Thereafter, in an effort to "clear the air," Mr. Saffer confronted Plaintiff after a track inspection walk in Lorton, Virginia and accused Mr. Hager of "talking badly" about him to others.

19. On April 4, 2022, Mr. Saffer and Mr. DeAnnunitis, met with Plaintiff to review ongoing changes in the work plan and the ongoing problems that had occurred as a result of incorrectly scheduling the sequence of the work gangs at the Thorn Project. By this time, the work of the rail and tie gangs had been delayed and costs significantly increased because of the improper scheduling and sequencing of the gangs and the work plan. Mr. Saffer's imposed deadlines for the Thorn Project were not met because of a host of problems that required correction.

20. From April through May 13, 2022, at which time Plaintiff was out on leave due to the birth of his newborn child pursuant to the Family and Medical Leave Act, Plaintiff worked with Mr. DeAnnunitis and Mr. Saffer to revise the Thorn Project plans as issues arose. The expectations for cost and the timing of completion kept changing due to ongoing problems caused by Mr. Saffer's mismanagement and poor planning of the project.

21. Eventually, Mr. DeAnnunitis told Plaintiff that he was moving to a new position due to Mr. Saffer's mismanagement and poor project planning.

Case ID: 230801930

22. The tracks and ties on the Thorn Project were finally installed at the end of July, 2022. However, it was necessary to bring back both the Resurfacing Gang to finish the project and then the Tie Gang to re-secure ties destroyed during the second resurfacing process. The Thorn Project would not be completed until the end of December, 2022.

23. In the Spring of 2022, Plaintiff provided information to SEPTA's Office of Inspector General (OIG) as part of its investigation of a complaint filed by a union foreman, Jeffrey Carroll, of waste and mismanagement at the Thorn Project. Mr. Carroll's complaint mirrored many of the reports that Plaintiff had made about waste and wrongdoing on the Thorn Project. Plaintiff confirmed specific dates and confirmed incidents of waste and other allegations brought up by Mr. Carroll.

24. On May 12, 2022, Plaintiff informed Ms. Kristin Leese (Deputy Chief of Production) of his participation in the SEPTA OIG investigation. Plaintiff advised Ms. Leese that he did not report his participation to Mr. Saffer.

25. While Plaintiff was on FMLA leave from May 13, 2022 through July 27, 2022,[1] Mr. Ben Boylon was hired as Plaintiff's counterpart in charge of the Rail Gang portion of the Thorn Project. Plaintiff and Mr. Boylon communicated regularly about Plaintiff's safety and waste concerns on the Thorn Project.

26. On August 1, 2022, less than one week after returning to work from FMLA, Plaintiff was placed on a Performance Improvement Plan ("PIP") which was punitive and in retaliation for his reports to his superiors concerning the Thorn Project. The PIP was drafted by

---

[1] Plaintiff received a letter dated May 4, 2022 stating that FMLA leave was approved for that period. On May 11, 2022, Plaintiff received an email from Ms. Leese stating FMLA was instead being denied. Plaintiff called Tonia McMillian, Assistant Vice President of HRBP, and complained about this denial, after which Plaintiff was told on May 12, 2022 that a "mistake" had been made and that FMLA was approved.

Mr. DeAnnunitis and presented to Plaintiff in an August 1 meeting that included Plaintiff, Mr. DeAnnunitis, Ms. Leese and Mr. Saffer.

27. The PIP raised a number of illegitimate and fabricated issues regarding Mr. Hager's job performance, all of which were rebutted by Mr. Hager.

28. The PIP ended on November 1, 2022 and although the PIP specified that the "PIP Form Part B will document the outcome of the Performance Improvement Plan," Mr. Hager was not provided with any documentation and Kristin Leese told Mr. Hager that no such document was created.

29. Greg Mahowsky, Sr. Manager of Structures, who supervised Plaintiff during the period that Mr. Saffer was on FMLA leave, told Plaintiff that he did a good job and was doing everything that he was asked to do in the PIP and that he reported Plaintiff's good performance to Ms. Leese.

30. On August 8, 2022, Plaintiff filed an internal complaint of retaliation and harassment with Amtrak Ethics Point.

31. Following Mr. DeAnnunitis' promotion to another position on August 8, 2022, there was no Manager of Engineering Production to assist Plaintiff from August 8, 2022 until that position was finally filled in January 2023. As a result, Plaintiff's job duties significantly changed and substantially increased as he was essentially doing the job of two people, as he reported directly to Mr. Saffer.

32. Plaintiff worked with Mr. Saffer on the Cork Project ("Cork Project"), another project which had been primarily planned by Mr. Saffer. This project was supposed to begin in August, 2022, but was delayed.

Case ID: 230801930

33. Before Mr. Saffer went out on FMLA leave from September 12 until November 21, 2022, Plaintiff told Mr. Saffer that his Cork Project work plan was flawed, because Mr. Saffer planned to use pre-plated ties with cut spike ties. Plaintiff told Mr. Saffer that the use of pre-plated ties posed a significant safety issue that could lead to a break in the rails and train derailment, as well as problems with the pre-plated ties having to be replaced by regular ties. Further, the use of pre-plated ties violated federal track safety standards and regulations, as well as Amtrak engineering requirements and policies.

34. Notwithstanding, Plaintiff's admonitions, Mr. Saffer chose to cut corners and insisted on the use the pre-plated ties to expedite the project. He simply refused to listen to Plaintiff and instructed him to prepare a power point presentation for the Cork Project which was scheduled to be presented to the entire Amtrak Production Department on September 12, 2022.

35. On September 7, 2022, Plaintiff met with Ms. Camille Silverman, Project Manager for the Thorn and Cork Projects, in order to prepare a power point presentation to the Amtrak Production Department on the Cork Project. At the meeting, Plaintiff reported to Ms. Silverman about his safety concerns relative to using the pre-plated rail ties.

36. Before Mr. Saffer went out on his FMLA leave, Mr. Saffer told Plaintiff that "I know you've been talking shit about me."

37. On September 14, 2022, Plaintiff went on a walk-through of the Cork Project with Ms. Silverman, Jim Sullivan (her boss), and Ed Schloman, Mr. Saffer's counterpart for Amtrak's Track Laying System (TLS). During the walk-through, Plaintiff discussed with Mr. Schloman the fact that the pre-plated rail ties presented a safety issue and that Plaintiff had told Mr. Saffer that regular rail ties needed to be used, although Mr. Saffer refused to listen to Plaintiff and insisted on his own plan.

Case ID: 230801930

38. Thereafter, on or about September 14 or 15, 2022, Plaintiff reported to Ms. Leese about the use of the unsafe, pre-plated rail ties that Mr. Saffer insisted on using for the Cork Project and advised her of the specific Amtrak Track Maintenance Bulletin #02-15, which prohibited the use of pre-plated rail ties on the Cork Project.

39. Subsequently to Plaintiff's reports to Mr. Schloman and Ms. Leese, Mr. Saffer's plan was scrapped and a new plan was developed using the regular ties, which still needed to be ordered before the project could begin.

40. Plaintiff later found out that without his knowledge, Mr. Saffer had already pre-ordered approximately 4,000 to 6,000 pre-plated ties which were unloaded at the work site, as well as blank rail ties without the securing hardware.  This resulted in significant waste and cost overruns since these materials could not be used on the Cork Project.

41. While Mr. Saffer was out on FMLA, Plaintiff was supervised by Greg Mahowsky, Senior Manager of Structures, and Ms. Leese for both the Thorn and Cork Projects. Plaintiff complained and reported to Mr. Mahowsky and Ms. Leese on many occasions about Mr. Saffer's mismanagement, including the waste, safety concerns and violations of Amtrak engineering requirements and policies.

42. From August until November 2022, Plaintiff interacted daily with Rodney Mace and Paul Beauford of ARGO Management Consulting Company, a global operations strategy and performance improvement consulting company that was hired by Steven Gardner, VP of Amtrak, to evaluate waste and management at Amtrak. Messrs. Mace and Beauford were assigned to work daily on the Thorn Project. Plaintiff reported to them about Mr. Saffer's mismanagement of the Thorn and Cork Projects, including the waste, safety concerns and violations of Amtrak engineering requirements and policies.  Plaintiff also reported to Messrs.

Mace and Beauford about his prior complaints, his participation in the waste investigation conducted by SEPTA's OIG, and the retaliatory and baseless PIP that he was placed on.

43. In November of 2022, without explanation, Mr. Beauford informed Plaintiff that he and Mr. Mace were being reassigned away from the Thorn Project and did not have any further interaction with Mr. Hager.

44. Plaintiff also reported to Rick Oliver, Manager of the Undercutter Project, about Mr. Saffer's mismanagement of the Thorn and Cork Projects, including the waste, safety concerns and violations of Amtrak engineering requirements and policies. Mr. Oliver, who had previously managed tie gangs, expressed his agreement with Plaintiff's concerns about Mr. Saffer's mismanagement.

45. Plaintiff also spoke frequently with Camille Silverman, the Project Manager for both the Thorn and Cork Projects, about Mr. Saffer's mismanagement of those projects, including the waste, safety concerns and violations of Amtrak engineering requirements and policies.

46. The Thorn Project was finally completed at the end of December 2022, tens of millions of dollars over budget.

47. Mr. Saffer sought to deflect blame for the problems with the Thorn Project onto Mr. Hager by bad-mouthing Plaintiff to Ms. Silverman, Ms. Leese, and Josh Kessler, falsely blaming the delays and cost overruns on Plaintiff's refusal to pressure the tie gang to work harder.

48. Plaintiff also expressed other concerns about Mr. Saffer's plan for the Cork Project, which included unreasonably requiring the nightly installation of 250 ties. Moreover, the Tie Gang work plan outlining the numbers of workers and equipment to be dedicated was

Case ID: 230801930

unresolved. Nonetheless, Plaintiff was informed that the budget may need to be cut. In November, 2022, Plaintiff told Ms. Leese that Mr. Saffer's Cork Project plan should be scraped in its entirety as it was likely to fail and require more resources in the end. Moreover, there was an insufficient number of workers and insufficient equipment to meet the production goals. Furthermore, Plaintiff complained that the anticipated cuts in personnel and equipment would result in safety issues. Plaintiff complained again to Ms. Leese about this in December and also mentioned it to Amanda Kessler (Manager Reference Surfacing), Rick Oliver, and Ms. Silverman.

49. In December, 2022, Mr. Saffer wrongly accused Plaintiff during a "Pulse Call" of allowing workers on the track, after the foreman had left. Plaintiff corrected him during the call stating that this did not happen and later confronted Mr. Saffer about his false accusations against him to which Mr. Saffer responded: "I know you have been talking shit about me."

50. Mr. Saffer met with Plaintiff in late December, 2022 to review his annual performance evaluation, telling Plaintiff that he was rating him a "2," or satisfactory, which would have enabled Plaintiff to receive a 7% salary increase and a possible 5% bonus. Then in January, 2023, Plaintiff called him to complain that he didn't get a salary increase in his paycheck. Mr. Saffer said that he must have been bumped down to a "1", unsatisfactory rating, because Plaintiff had been placed on a PIP, which would prevent him from getting any increase. After complaining to HR and to Ms. Leese, Mr. Hager's salary was increased to $115,000 in January 2023 as part of an across the board market adjustment in pay. Plaintiff received nothing in the way of a bonus.

51. On January 9, 2023, Plaintiff met with Ms. Leese, Chris Bumgardner, Manager Production Engineering, and Mr. Saffer to review the revised work plan that Mr. Saffer had

Case ID: 230801930

drafted for the Cork Project which contained personnel and equipment cuts, while continuing to call for the completion of 250 ties per night. Mr. Saffer further reiterated that overtime would not be permitted. Plaintiff was shocked to see that the production goal of 250 ties per night had not been reduced, given the reduction in workers and equipment allocated by Mr. Saffer. Instead of 37 workers, the project was slated to receive only 25 workers, which would also result in less equipment being utilized due to a reduction in operators. Plaintiff questioned him during this meeting about how the goal of 250 ties was decided. Mr. Saffer's response was that the System Track Department ran an algorithm and arrived at this production goal. Plaintiff also asked him how he could cut resources and workers and not make a comparable cut in the production goals, contending that it just did not make sense. Plaintiff also expressed concerns about safety issues that would likely result if an understaffed and relatively inexperienced Tie Gang was being pushed to meet unrealistic production goals without any overtime possibility.

52. The delays on the Cork Project resulted in forfeiture of millions of dollars that had been allocated to the Cork tie replacement program, because the funds were not expended in time.

53. On February 3, 2023, a meeting was held with Ms. Silverman, Mr. Saffer, Mr. Bumgardner, and Plaintiff to discuss the Cork Project. Plaintiff again questioned Mr. Saffer about how the production of 250 ties a night was created. After the meeting, Mr. Saffer reprimanded Plaintiff for questioning his judgment and making him look bad in front of all the other meeting participants.

54. After the February 3, 2023 meeting, Plaintiff complained to Ms. Silverman again about the nightly goals of 250 ties and Mr. Saffer's mismanagement.

13

55. On February 10, 2023, Plaintiff called Amanda Kessler, Project Manager of the System Track Department, and asked her how her department came up with the 250 nightly production goals. She said her department did not run any such algorithm, as had been represented by Mr. Saffer. Rather, she explained that Mr. Saffer and Ms. Leese arbitrarily came up with this number. Ms. Kessler said she would talk to her boss about this. She also asked Plaintiff to email her an outline of what a traditional tie gang would need to look like in order to produce the 250 nightly tie production goals. Plaintiff sent her that information.

56. On February 8, 2023, Kristin Leese emailed Plaintiff to ask where the equipment for the Cork Project was located, because her superiors were starting to question why the Cork production goals were not being meet. She also questioned Plaintiff as to why he did not use the workers the night before to install ties, as opposed to simply laying out the work. Plaintiff responded, sending her a draft of the ideal staffing and equipment allocation necessary to safely meet the high production goals of the Cork Project, which was not implemented due to budget cuts. He also sent her an email again emphasizing and explaining his concerns about safety given the unrealistic production goals and budgetary cuts in resources and staffing. In that email, Plaintiff pointed out that the Tie Gang had an impeccable safety record and that he planned to keep it that way. Plaintiff expressed further his concern that at present he only had one relatively inexperienced foreman (two foreman positions were not filled), two Tripp machine operators (who were in the process of being qualified), and only 25 workers instead of 37, which was the ideal tie gang composition.

57. During February 2023, Plaintiff's relationship with Mr. Saffer became even more strained as safety and cost concerns became even more heightened.

58. On February 23, 2023, Plaintiff was called into a meeting at Amtrak's 30th Street Station, Philadelphia headquarters with Mr. Saffer, Kristin Leese, Chris Bumgarten, and was presented with a letter stating that he was being terminated from his job due to the "loss of confidence in your ability to perform the functions of Assistant Production Engineer." Mr. Saffer was also reading from a document and stated that Plaintiff could not properly plan jobs, order materials, or answer emails in a proper and timely manner. Plaintiff asked for a copy of this document and Mr. Saffer refused to provide him with a copy. Plaintiff was then escorted out of the building by armed Amtrak Police and provided with a one-way ticket to Paoli.

59. Plaintiff's firing came as a surprise to him, as prior to and after the PIP was issued and resolved, Plaintiff had never been issued any warnings about his job performance.

60. Plaintiff was made to be a scapegoat for Mr. Saffer's failures and was unlawfully retaliated against by Mr. Saffer and Amtrak as a result of his multiple reports, as detailed above, of Mr. Saffer's mismanagement of the Thorn and Cork Projects, including the waste, safety concerns and violations of Amtrak engineering requirements and policies.

## COUNT I

**VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW**
**Bryan Hager v. Amtrak**

61. All preceding paragraphs are incorporated by reference as if set forth herein in full.

62. Pennsylvania law provides Plaintiff with relief pursuant to the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et seq.* ("Whistleblower Law").

63. Amtrak is subject to the Pennsylvania Whistleblower Law as an "Employer" because it is a recipient of funding by or through the Commonwealth of Pennsylvania and/or its political subdivisions. For example, approximately $3.7 million in Commonwealth funds have

Case ID: 230801930

been provided for track work to make possible Amtrak service between New York and Scranton, PA. Furthermore, the Commonwealth has long paid for the "Keystone" and "Pennsylvanian" service, a state-supported Amtrak train service operating daily between New York and Pittsburgh, funded primarily through Commonwealth funds from the Pennsylvania Department of Transportation.

64. By making written and verbal good faith reports of waste and wrongdoing as set forth hereinabove, Plaintiff comes within the definition of a whistleblower under this law as "a person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."

65. As set forth hereinabove, Plaintiff fits within the protected class of employees under the Whistleblower Law, as he was retaliated against as a result of engaging in protected conduct. Specifically, §1423(a) thereof provides that "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employer's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."

66. By reason of the Defendant's actions, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands a trial by jury and judgment in his favor and against Defendant Amtrak and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, reasonable

Case ID: 230801930

attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

**MARK D. SCHWARTZ, ESQUIRE**

By: /s/ Mark D. Schwartz
Mark D. Schwartz, Esquire (Pa ID #30527)
P.O. BOX 330
BRYN MAWR, PA 19010
Telephone & Fax 610 525-5534
Markschwartz6814@gmail.com

**THE PEARLMAN LAW FIRM, PLLC**

By: /s/ Jason L. Pearlman
Jason L. Pearlman, Esquire (Pa ID #93879)
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004
610-660-7793
jpearlman@pearlmanlawfirm.com

DATED: August 17, 2023

*Attorneys for Plaintiff Bryan Hager*

17

## VERIFICATION

I, Bryan Hager, do hereby certify that I am the Plaintiff in the within action, and that the facts contained in the foregoing Complaint are true and correct to the best of my knowledge, information and belief. I do further understand that these statements are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsifications to authorities.

_____
Bryan Hager

Dated: 8/17/23

18

Case ID: 230801930